A11A0931. BENNETT v. MOORE.

(718 SE2d 311)

ELLINGTON, Chief Judge.

In this personal injury case arising from the collision of two vehicles, Theodore Moore filed suit in the Superior Court of Chatham County against Erin Bennett, asserting the following claims: Count 1 — negligence; Count 2 — negligent infliction of emotional distress based upon his physical injuries; and Count 3 — negligent infliction of emotional distress based upon his being within the "zone of impact" when his grandson, who was a backseat passenger in his car, was ejected from the back window of the car as a result of the collision. Following a jury trial, the trial court entered judgment on the jury's verdict in favor of Moore, awarding him damages in the amount of $348,556. On appeal from the denial of her motion for new trial, Bennett asserts that Moore was precluded as a matter of law from recovering on Count 3 of his complaint and, because the trial court erred in failing to timely grant judgment in her favor on Count 3, Moore was able to present to the jury substantial irrelevant and highly prejudicial evidence. She contends

that the presentation of such evidence improperly influenced the jury's award of damages, especially in light of the court's refusal to give the jury two of her requested jury instructions. Bennett also asserts that the trial court erred in charging the jury on the concept of "sudden emergency" and in failing to grant her motion for a directed verdict as to Moore's claim for future medical expenses.

As explained below, we conclude that the jury was authorized to find Bennett liable on Counts 1 and 2 of Moore's complaint, and we affirm the judgment on the verdict to that extent. We also agree with Bennett's contentions, however, that Moore was precluded as a matter of law from recovering on Count 3 of his complaint and that, because the jury was exposed to substantial, highly prejudicial evidence and argument in support of that claim, and because the court's charge to the jury failed to rectify the error, the award of damages to Moore must be reversed. Therefore, we reverse the court's judgment as to the award of damages and remand this case for a retrial as to damages on Moore's claims under Counts 1 and 2 only.

Viewed in the light most favorable to the jury's verdict,[1] the record shows the following facts. At approximately 7:20 p.m. on August 2, 2008, Moore was driving south in the middle lane of highway I-95 in Chatham County. His wife was sitting in the front passenger seat, and his six- and twelve-year-old granddaughters and sixteen-year-old grandson were in the back seat. At the same time, Bennett was driving her sports utility vehicle ("SUV") in the same direction in the left lane. As Bennett's SUV was passing Moore's car on the left, Moore's wife and one of his granddaughters yelled out that the SUV was going to hit Moore's car. Immediately thereafter, and without using a turn signal, Bennett started to change lanes and drove her SUV partially into the middle lane, striking Moore's car. Moore spontaneously moved a few feet into the right lane before moving back into the middle lane. At the same time, Bennett jerked her SUV to the left and then back into the middle lane, where her SUV hit Moore's car again, a few seconds after the first contact. The second contact caused Moore to lose control of his car, and the car swerved to the right and started spinning as it went down into a ravine, hitting trees and a fence along the way.

At some point between the time the car careened off the highway and when it came to a stop in the ravine, Moore hit his head on the windshield and lost consciousness. According to an eyewitness who stopped to help after the collision, Moore regained consciousness after she had been caring for his granddaughters for a few minutes;

---

[1] *Almond v. McCranie*, 283 Ga. App. 887, 888 (643 SE2d 535) (2007).

he asked her what had happened and whether his family members were okay, and she attempted to calm him.

At the hospital, Moore was treated for a head contusion, lacerations on his face, and neck pain; he was released early the next morning. His wife suffered a broken neck, a punctured lung, six broken ribs, and other injuries, and each of Moore's granddaughters suffered a broken pelvis and other injuries. In addition, after Moore and his wife were transported to the hospital, they learned that their grandson, Kevin Moore, had been thrown through the back window and ejected from the car at some point after the collision. Kevin Moore suffered a broken neck and head injuries that rendered him severely and permanently brain damaged and physically disabled.

In March 2009, Moore filed a complaint against Bennett in which he asserted that, as a result of her negligence, he had suffered property damage; serious physical injuries; past, present and future medical bills; and past, present and future physical and mental pain and suffering (Count 1).[2] As noted above, he also asserted claims for negligent infliction of emotional distress based on his physical injuries (Count 2) and for negligent infliction of emotional distress based on his having been within the "zone of impact" when his grandson was ejected from the car and injured, his having seen his grandson being ejected from the car, and his having been a witness to his grandson's "horrific and permanent injuries" that resulted from the collision (Count 3).

Bennett answered the complaint, and, on February 22, 2010, she filed a timely motion for partial summary judgment as to Count 3, asserting that Moore was precluded from recovering on Count 3 under the "zone of impact" theory because Georgia law only recognizes negligent infliction of emotional distress claims under that theory when the plaintiff witnesses the death of a child or a spouse.[3] Bennett pointed out that, in this case, the undisputed evidence showed that Moore was unconscious after the second collision and, thus, did not see his grandson when he was ejected from the car or while the boy was at the accident scene; Moore is neither the boy's parent or spouse; and, although the grandson was seriously and permanently injured, he has not died from those injuries. Bennett requested oral argument on her motion in both the body of the motion and a separate document entitled "Request for Oral Argument" filed the same day. She also filed a motion in limine to exclude all evidence of the injuries to Moore's grandson, asserting

---

[2] Before Moore filed suit, Bennett's insurance company settled the personal injury claims of Moore's wife and their grandson.

[3] See Division 3, infra.

that such evidence was irrelevant, cumulative, and highly prejudicial.

Moore responded to Bennett's motion for partial summary judgment on March 31, 2010, and a hearing was scheduled for April 20. Due to a potential scheduling conflict, however, the hearing was postponed, and, on April 21, Bennett filed a renewed request in which she asked the court to reschedule the hearing on her motion "before trial (scheduled to begin on May 17th), with sufficient time to allow the Court to rule on the motion[ ] before the start of trial." There is nothing in the record to show that the trial court responded to or ruled on Bennett's renewed request.

On the first day of trial, when the court asked Bennett's counsel if she was ready to proceed, counsel responded that there were some outstanding pretrial motions and the motion for partial summary judgment and that she would like to be able to address them at that time. The court acknowledged that she had requested a hearing on her summary judgment motion and said that she would be given one. While the court attended to other pretrial issues, Bennett's counsel reminded the court of the outstanding summary judgment motion two more times. Then, while the court was addressing Bennett's motion in limine to exclude evidence of the injuries to Moore's family members,[4] her counsel told the court that the motion in limine and her motion for partial summary judgment on Count 3 of the complaint were "tied in together," explaining that evidence of the injuries to Moore's family members was irrelevant and prejudicial if Moore was legally precluded from prevailing on Count 3. Then, without addressing the merits of Bennett's partial summary judgment motion (i.e., whether Moore could legally prevail on Count 3), the court granted the motion in limine in part, excluding all post-collision photographs of Moore's grandson.[5] The court ruled that, otherwise, evidence of the family members' injuries would be admissible to prove the force of the impacts between the vehicles during the collision. The court also allowed Bennett to have a continuing objection to evidence "concerning emotional distress to [Moore] or damages that he might [be able to] recover for emotional distress regarding Kevin Moore's injuries."

As for Bennett's motion for partial summary judgment on Count 3, the court stated that there had been no pretrial hearing because Bennett's counsel had a potential scheduling conflict with the

---

[4] During the hearing, Bennett's counsel verbally expanded her motion in limine to seek the exclusion of any evidence relating to the injuries suffered by any of Moore's family members.

[5] During discussion on the motion, Moore's counsel stated that he did not intend to bring Kevin Moore into the courtroom during the trial.

original hearing date and "the possibility of getting it rescheduled before trial was almost nearly impossible based upon the Court's schedule." The court then informed the parties that it would not conduct a summary judgment motion hearing during the trial, that the outstanding motion was not going to stop the trial from proceeding, and that, under the law, the court could wait to rule on the motion "until a verdict gets ready to come in." However, the court warned Moore's counsel that, because it had not ruled on whether Moore would be able to recover on Count 3, "you may want to be very careful about putting anything in [evidence] with respect to that motion, depending on how I may rule on that later on." In addition, the court instructed Moore's counsel to redact a videotaped deposition of Moore's primary physician to exclude the physician's opinion regarding the negative effect of the family members' injuries on Moore's mental and emotional state.

In response to those directions, Moore's counsel stressed to the court that, because it had not ruled on Bennett's summary judgment motion, Count 3 was still a viable claim. As a result, Moore was in the "precarious position" of having been warned by the court that he should *not* present evidence in support of Count 3, yet he was *required* to present such evidence in order to avoid a directed verdict on that count. Nonetheless, the court reiterated that it could rule on the motion up until the jury had reached a verdict or, after the jury had returned a verdict, it could grant a motion for judgment notwithstanding the verdict.

After the jurors entered the courtroom, the trial court gave them preliminary instructions; the parties then presented their opening statements to the jury. During his opening statement, Moore's counsel not only described the collision and Moore's injuries, but also talked explicitly and repeatedly about the injuries to Moore's family members, his grandson's resulting massive, permanent disabilities, and the guilt and depression that Moore experienced as a consequence of those injuries. For example, Moore's counsel made the following statements:

> [Moore's grandson suffered] massive brain damage when he goes out the back end of [the car's] window as this car comes down twisting off of I-95, down that ravine, down that road twisting. Kevin Moore comes out the back end of that car. He suffers massive hemorrhaging of the back of his head, a broken neck, a broken pelvis. As we talk today he sits in a hospital bed in Atlanta, Georgia at his parents' home. . . .

Before the night of August 2nd, 2008[,] Kevin Moore was a good tennis player. He was going to go . . . play tennis in his last week of summer vacation with his granddad. . . .

[Bennett's husband took] several pictures of the road [after the collision]. He sees Kevin on the ground. He walks back there. He does nothing but take pictures of this boy who is already badly brain damaged. . . .

[As a result of the collision, Moore's] head hits the windshield. Glass comes into it. He has a very bad neck as one can imagine, coming out of the car that I showed you. He has a grandson with brain damage, two [injured] granddaughters, a wife with a broken neck. And immediately the depression that stays with him starts to set in because he was behind the wheel, because he says what could I have done different[ly]. What could I have done different[ly]. . . .

And the depression starts to set in on [Moore]. . . . [According to the January 2009 notes of Moore's physician,] Kevin [was] in the hospital. He [was] taken to Shepherd Spinal Center in Atlanta[,] from which he [was] discharged six months later. [Moore and his wife spent] a month with him up there. [Moore did] not work for the next five months after this wreck. . . .

[At that January 2009 visit, the physician noted that Moore] can't sleep. He breaks down frequently. He has flashbacks. He has nightmares. He has severe depression, and he has elevated blood pressure. And he still has all those things, still has all those things from that night of August the 2nd. . . . [Moore still has] major depression, anxiety. [Moore] knows that Kevin sits in a hospital bed with 24 hour a day care. Not breathing on his own, not talking, not walking. And that [his grandson] was [seated] behind him in that car. [Moore is] unable to drive down the interstate. . . . He's just got this fear after that night.

Moore's first witness was his wife, who testified about the collision, her injuries, and the injuries to Moore and their grandchildren. She said that, as a result of the collision, Kevin suffered a brain injury and will "never be the same for the rest of his life[.] . . . [Y]ou can talk to him. But he can't talk to you[.] He just looks at you." When asked to describe how she feels about her grandson's injuries, she said she was "[l]ost without him. Our li[ves] will never be the

same. . . . [O]ur grandkids and our family are our best friends[.] . . . [W]e did all the vacations together. Everywhere we went[,] we spent time with our family[.]" She also testified that her husband "has nightmares, and he wakes up with sweats. And he cries still a lot[.] We just miss Kevin because . . . he was just our life[.] We just miss him so much[.]" When asked if she thought her husband had been getting better over the last few months, she responded that

> I don't think he's ever going to be better[.] He's always going to feel like it's his fault. . . . He tries [to get back to normal,] but he misses Kevin. [He] and Kevin were so close. [T]hey spent a lot of time together[,] riding the four wheeler, the jet ski, playing tennis. I mean we spent a lot of time with Kevin[.]

Moore's next witness was a woman who saw the collision and the aftermath and who stopped to help while waiting for emergency crews to arrive. She testified that, after checking on Moore's granddaughters in the back seat of the car, she saw

> a leg sticking out of the tree line. And I ran over to where I saw the legs [with another woman who was a nurse]. . . . [W]e went over to the boy that was in the tree line. He had some severe head injuries, and he was bleeding. We heard what sounded like a gurgling, like blood was in his throat or in his lungs. So we immediately . . . got him out because his head was lower than his heart[, and] we brought him up the embankment so that he was a little bit more even as gently as we could.

The eyewitness testified that she then went back to Moore's car and tried to calm down his granddaughters because they were in shock and starting to cry. According to the eyewitness, "we were singing our ABC's. They were showing me how smart they were. Then I helped the little girl get the seatbelt off of her because she was tied up in it." After the rescue workers got the girls out of the car, they took them to where the eyewitness was sitting, laying one of them next to the woman and the other on the woman's lap "because [the little girl] didn't want to be anywhere else."

In addition to other witnesses, Moore presented the redacted, videotaped deposition testimony of his primary physician. The physician deposed that, when he saw Moore five days after the collision, Moore said that his grandson was in the hospital with brain damage and in a coma and that his wife had had neck surgery. The physician observed a small contusion on Moore's head and a small

laceration on the right side of his head, and, although Moore reported having some neck pain, he did not report having any headaches. According to the physician, Moore was in a great deal of emotional distress at that time, and Moore told the physician that he did not feel able to work. When asked to what did he attribute Moore's depression, the physician responded, "Only that he was just in a recent severe motor vehicle accident in which his wife was injured and his grandson was in [the intensive care unit at the hospital]." The physician deposed that, at a subsequent visit in November 2008, Moore still had major depression, explaining that Moore "always talk[ed] about . . . the motor vehicle accident. His grandson was moved to Atlanta [for treatment]. [Moore] was just devastated with feelings of guilt and depression."[6] At a June 2009 visit, the physician noted that Moore's 40-year-old son had suddenly died of a heart attack in April and that the additional stressor made Moore's emotional condition go "back to square one[.] Anxiety, severe depression." According to the physician, during at least one visit, Moore expressed some guilty feelings about the collision because he was driving and was wondering if he could have done anything to prevent it. On cross-examination, the physician admitted that, according to his treatment notes, Moore did not complain to him of any neck pain or headaches at any visit after October 2008, two months after the collision.

Later, Moore took the stand to testify, but, before he was asked about the collision or his injuries, his counsel asked him if Kevin had to be moved to the Shepherd Spinal Center in Atlanta for treatment after he was injured in the collision. Moments later, counsel said, "Let's talk about Kevin, and then we'll come back to the wreck. Since the evening of August the 2nd, 2008[,] has he ever been able to walk? . . . to talk? . . . to care for himself?" Moore responded, "No, sir" to each question. Counsel then asked, "What was your relationship like with Kevin?" Moore responded, "Like my son," adding that they played golf and tennis and fished together "[l]ike grandfather and grandson" and that he and his wife had hoped Kevin would live with them in Savannah and go to college there. Moore then testified about the collision, stating that he was unconscious after the car started spinning off the highway and into the ravine and that he did not remember anything that happened from that time until he arrived at the hospital. Moore testified that he has had "[f]lashbacks of the wreck, of going to the hospital, of seeing my grandkids, my wife, Kevin especially. Hoping that he would come through. And it's

---

[6] Notably, the trial court had specifically ruled that Moore should redact this sentence, as well as the previous sentence, from the videotape of the deposition before playing it for the jury.

been two years and nothing. But we're praying." Moore's counsel asked if there had been hope for Kevin "at the beginning," and Moore said, "Yes, sir," but he answered, "No" when his counsel asked, "Is there hope now?" Moore also testified that he felt guilty about the collision because he was driving and his wife and grandchildren were in the car, although he knew there was nothing else he could have done to prevent it.

Regarding his damages, Moore testified that he incurred $2,555 in medical bills for his treatment at the hospital on the night of the collision; that he has experienced depression, anxiety, post-traumatic stress disorder, difficulty concentrating, difficulty sleeping, and flashbacks since the collision; that his primary physician prescribed various medications for him since the collision that cost approximately $213 per month; that the last time he visited his physician was in October 2009, seven months before trial; and that no physician had told him that he was unable to work at the time of trial or that he had any permanent disability or permanent impairment as a result of the collision. He also testified that he took about five months off of work following the collision because he was afraid to drive and because he wanted to stay at home and take care of his family. His lost income amounted to approximately $12,500. Moore returned to work in January 2009 and then retired in December 2009; during that time period, he missed no work as a result of his injuries from the collision.

After both parties had presented their evidence and rested, Bennett's counsel moved for a directed verdict on Count 3 on the same bases she had asserted in the partial summary judgment motion, and she also moved for a directed verdict as to Moore's claim for future medical expenses. The court denied the motion as to future medical expenses, and asked Bennett's counsel if she would like to present oral argument on her motion for partial summary judgment at that time. Noting that she had essentially presented her arguments at the beginning of trial and again at the time of her motion for a directed verdict, Bennett's counsel withdrew her request for oral argument.

The next morning, the court announced that it was going to address Bennett's motion for partial summary judgment; it also ruled on the record that Bennett had expressly waived her right to an oral argument on the motion. Then, after acknowledging that it was bound by existing precedent, the court granted summary judgment to Bennett on Count 3 of Moore's complaint.

The trial court conducted a charge conference, and the jury returned to the courtroom; the court, however, did not tell the jury that it had ruled that Moore could not recover on his claim for negligent infliction of emotional distress as a result of the physical

injuries of his family members. Then, despite the court's explicit ruling on Count 3, Moore's counsel made the following statements during closing arguments:

> You've seen a woman . . . who saw the wreck who held two little girls in her hands, who talked to them about the ABC's while they both had broken pelvises. Who took her own time to get Kevin, whose feet were above his head when he was gurgling in that ditch[.] . . .

> You have a car that has four badly mangled bodies and one badly mangled mind. . . .

> You'd give up everything to get that boy back. . . .

> [T]his boy's life is over. . . . It's over. . . .

> Four mangled bodies and one mangled mind. This is a big wreck. . . .

> I hope that you can make [Bennett take responsibility]. You ought to be proud of what you're doing. You've got a privilege to exercise in about three hours. [Mrs.] Moore, broken neck, broken ribs, broken clavicle, broken scapula, torn ligaments of the knee. . . . Kevin Moore, skull base fracture, brain damage, broken neck, broken pelvis, multiple facial fractures. . . .

> [Moore's granddaughter], the little girl is held by [the witness] that night. Rib fractures, pelvic fractures. [Moore's other granddaughter], the little eight year old girl. She has anemia from internal bleeding, liver lacerations, and pelvic fractures.

Further, when he discussed damages and argued that Bennett's lawyers were only offering Moore "minimum wage" for all of the suffering he experienced as a result of the collision, Moore's counsel asked the jury the following question:

> If I put an ad in the Savannah New Press, and I [offered this] job, drive down interstate highway 70 miles an hour. Get blown off the road because you're hit by somebody that cuts you off. Lose control of your vehicle. Have those children yelling in the back. Have your grandson in this wreck brain damaged for the rest of his life as part of the

wreck. How many people are going to answer that [ad] at minimum wage? You'd have to be crazy.

Ultimately, the jury returned a verdict in favor of Moore and awarded him $350,000.[7] Following the denial of her motion for new trial, Bennett appeals, contending that the court erred in charging the jury on an issue related to her liability to Moore and challenging the court's rulings on several issues that allegedly impacted the amount of damages awarded by the jury.

*Affirming the Judgment as to Bennett's Liability.*

1. Bennett contends that the trial court improperly charged the jury on the affirmative defense of "sudden emergency," arguing that there was no evidence presented at trial to support it.[8] The trial court charged the jury as follows:

One who is confronted with a sudden emergency that was not created by one's own fault and is without sufficient time . . . to determine accurately and with certainty the best thing to be done is not held to the same accuracy of judgment as would be required of that person if he or she had more time for deliberation. The requirement is that the person act with ordinary care under all particular facts and circumstances surrounding the situation.

Pretermitting whether the charge was proper given the evidence presented, we conclude that there is no reasonable probability that the instruction, when read in context with the entire jury charge, misled the jury, erroneously affected the verdict, or was prejudicial to Bennett.[9] In fact, the instruction may have benefitted Bennett by supporting her defense that the collisions were the result of a sudden "accident" for which neither she nor Moore was at fault. Further, we

---

[7] Pursuant to a stipulation by the parties, the jury's award was reduced by $1,444, and the court entered judgment in favor of Moore in the amount of $348,556.

[8] When a jury charge is challenged on appeal, this Court
will not overturn a trial court's decision to give a particular jury charge if there was *any evidence* presented at trial to support giving the charge. In determining whether some evidence exists to support an instruction, an appellate court is not authorized either to weigh existing evidence or to judge witness credibility as these matters are within the province of the jury. [Thus, a] trial court does not err when it charges the jury on a particular issue even when the evidence justifying the charge is slight.
(Citation and punctuation omitted; emphasis in original.) *Collins v. Mitchell*, 282 Ga. App. 860, 861 (1) (640 SE2d 364) (2006).

[9] "[A]n inapplicable jury instruction is not grounds for reversal where it does not appear that the inapplicable part was calculated to mislead the jury, erroneously affected the verdict or was prejudicial to the rights of the complaining party, because it did not inject issues outside the pleadings or evidence." (Punctuation and footnote omitted.) *Ga. Dept. of Transp. v. Miller*, 300 Ga. App. 857, 868 (5) (686 SE2d 455) (2009).

find that the instruction could not have improperly benefitted Moore, because there was no evidence to support a finding that he was negligent or that his actions caused or contributed to either of the impacts. All of the witnesses who testified on behalf of Moore stated that Bennett's SUV improperly crossed from the left lane into the middle lane two times without signaling and without ensuring that the lane was clear and, as a consequence, it twice collided with Moore's car. Moreover, the witnesses unanimously testified that Moore did nothing improper that caused or contributed to the collision. In fact, Bennett herself testified that the only thing that she believed Moore did wrong was his failure to keep control of his car *after* her SUV "tapped" it; she also admitted, however, that she had never been hit unexpectedly by another car under these circumstances. Moreover, although Bennett's husband initially told an investigating officer that Moore "sped up" when Bennett tried to pass him so she could move into the middle lane, Mr. Bennett admitted at trial that he was resting with his eyes closed when the collision occurred and that he did not see the collision or see Moore's car until *after* the second impact. In addition, an investigating police officer testified that there were skid marks in the middle lane of the highway and that, based on what he observed at the scene and his interviews with Bennett and other witnesses, it was beyond dispute that Bennett's SUV collided with Moore's car in the middle lane, thus making Bennett responsible for the collision. Finally, Bennett admitted at trial that she did not dispute the accuracy of a police diagram of the incident that showed her SUV as being across the line dividing the left and middle lanes when the vehicles collided. Thus, because there was overwhelming evidence to support a finding that Bennett was solely at fault in causing the collision, there is no reasonable basis to conclude that the sudden emergency instruction prejudiced the jury's verdict as to Bennett's liability.

Consequently, having found no merit to this alleged error, we affirm the trial court's judgment to the extent that it holds Bennett liable for Moore's damages on Counts 1 and 2 of his complaint.

*Reversing the Judgment as to Damages.*

2. According to Bennett, the trial court improperly denied her motion for a directed verdict as to Moore's request for future medical expenses because Moore failed to present any evidence from which the jury could determine the value of such expenses. We agree.

> A directed verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced together with all reasonable deductions or inferences therefrom demands a particular verdict. . . . The

> standard of appellate review of the trial court's denial of a
> motion for a directed verdict is the any evidence standard.

(Citations and punctuation omitted.) *F. A. F. Motor Cars v. Childers*, 181 Ga. App. 821 (1) (354 SE2d 6) (1987). "An award of future medical costs must be supported by competent evidence to guide the jury in arriving at a reasonable value for such expenses." (Citation and punctuation omitted.) *Bridges Farm v. Blue*, 221 Ga. App. 773, 774 (1) (472 SE2d 465) (1996), rev'd in part on other grounds, 267 Ga. 505 (480 SE2d 598) (1997).

As shown above, Moore testified that he had about $2,500 in costs from his emergency room treatment and that his prescribed depression and anxiety medications had cost approximately $213 per month for the past two years. The evidence showed, however, that his depression and anxiety arose primarily from the injuries to Kevin and his other family members and was exacerbated by the sudden, unexpected death of his son. Further, Moore failed to show that he incurred any other medical treatment costs or that he would need any future medical treatment for problems related to his injuries from the collision. Finally, other than his testimony that, in his opinion, he was still depressed and anxious at the time of trial, he failed to show that he would need to continue taking the depression and anxiety medications in the future, or, if so, any basis for the jury to determine how long he would need to do so.

Thus, because the record shows that no evidence was presented from which the jury could ascertain, except by mere conjecture and speculation, that Moore would have any future medical expenses or, if he did, the amount thereof, the trial court erred in failing to grant Bennett's motion for a directed verdict as to such damages. *Womack v. Burgess*, 200 Ga. App. 347, 347-348 (1) (408 SE2d 159) (1991); *Bridges Farm v. Blue*, 221 Ga. App. at 774-775 (1); *F. A. F. Motor Cars v. Childers*, 181 Ga. App. at 824 (5).[10] On remand of this case to the trial court, the court is directed to enter judgment in favor of Bennett

---

[10] See also *Hughes v. Brown*, 109 Ga. App. 578, 579 (1) (136 SE2d 403) (1964) (The evidence showed that the plaintiff had suffered serious, permanent injuries and would require some form of medical care and treatment for the rest of his life. "However, there was no evidence . . . from which the jury could ascertain other than by sheer conjecture and speculation what the plaintiff's future medical expenses would be[.]" Thus, it was reversible error for the court to submit to the jury the question of future medical expenses as an item of damages.) (citation omitted); cf. *Cox v. Cantrell*, 181 Ga. App. 722, 723 (2) (353 SE2d 582) (1987) (The plaintiff's physician testified that she was treated for cervical strain caused by a head injury she incurred in the automobile collision, that she had chronic or ongoing pain and muscle spasm, that she needed to be on constant physical therapy and medication, and that she would have intermittent episodes of pain and muscle spasms "for a very long time," if not permanently. This Court held that "[t]he fact that injuries which occurred several years prior to the trial are still disabling in character is itself sufficient to authorize a jury to find that such injuries are permanent.") (citation and punctuation omitted).

on this aspect of damages in accordance with her motion for a directed verdict. OCGA § 9-11-50 (e).

3. Although Moore did not appeal the trial court's grant of partial summary judgment to Bennett on Count 3 of his complaint, we nonetheless expressly rule that Bennett was, indeed, entitled to judgment in her favor on that count for the reasons asserted in her motion for partial summary judgment, as recounted above. See *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583 (533 SE2d 82) (2000);[11] *McCunney v. Clary*, 259 Ga. App. 260, 261 (1) (576 SE2d 635) (2003).[12]

In fact, we conclude that the only proper outcome of Bennett's motion for partial summary judgment was so obvious, given the plain and undisputed facts and the well-established legal precedent, that the trial court committed clear error in failing to rule on the motion before trial and, especially, in deferring its ruling until all of the evidence — much of it irrelevant and prejudicial to Bennett — had been presented.

> A motion for summary judgment is designed to provide a prompt and inexpensive method of disposing of any cause where the pleadings, depositions, and affidavits clearly show there is no issue of material fact, although the allegations of the pleadings standing alone may raise such an issue. . . . The very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial. Of course it is error to deny trial when there is a genuine dispute of facts; but *it is just as much error* —

---

[11] In *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583 (533 SE2d 82) (2000), the Supreme Court of Georgia ruled as follows:

> In a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury. . . . Thus, the current Georgia impact rule has three elements: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress. . . . [However, when] a parent and child sustain a direct physical impact and physical injuries through the negligence of another, and the child dies as the result of such negligence, the parent may attempt to recover for serious emotional distress from witnessing the child's suffering and death without regard to whether the emotional trauma arises out of the physical injury to the parent. This is in accord with the precepts of the impact approach and appropriately restricts recovery to those directly affected by the defendant's negligent act or omission.

(Citations, punctuation and footnote omitted.) Id. at 584-585 (I), 588 (III).

[12] In *McCunney v. Clary*, 259 Ga. App. 260, 261 (1) (576 SE2d 635) (2003), this Court held that, under Supreme Court precedent, a plaintiff may not recover for emotional distress that arose from witnessing his or her child or spouse suffer a nonfatal injury as the result of someone's negligence.

perhaps more in cases of hardship, or where impetus is given to strike suits — *to deny or postpone judgment where the ultimate legal result is clearly indicated.*

(Citations and punctuation omitted; emphasis supplied.) *Maxey-Bosshardt Lumber Co. v. Maxwell*, 127 Ga. App. 429, 433-434 (2) (193 SE2d 885) (1972).[13] As a consequence of the court's failure to issue a timely ruling, both parties were placed in an unnecessary state of uncertainty and the jury was allowed to hear extensive evidence that was so irrelevant and prejudicial that this Court is now forced to order a retrial on the issue of damages, as explained below.

4. Bennett contends that, despite the trial court's partial grant of her motion in limine[14] to exclude evidence of the injuries to Moore's family members (except to demonstrate the force of the impacts between the vehicles) and the effects of those injuries on Moore's emotional state due to its irrelevance and its excessively prejudicial nature,[15] it nonetheless allowed Moore to repeatedly present such evidence, and improper arguments based thereon, to the jury. Further, Bennett argues that the presentation of such evidence was especially harmful due to the court's refusal to give the jury two of her requests to charge that specifically instructed the jury on what damages were recoverable by Moore on his claim for negligent infliction of emotional distress (Count 2). We agree and find that there is a substantial likelihood that the erroneous admission of the irrelevant and prejudicial evidence misled and improperly influenced the jury and that the error was compounded by the court's failure to properly charge the jury on damages. Consequently, the judgment on the jury's award of damages to Moore cannot stand.

(a) As detailed above, Moore presented a significant amount of graphic and emotional evidence that was only relevant to Count 3 of his complaint, including his grandson's tragic and permanent disabilities, the devastating effect of the loss of his grandson's compan-

---

[13] See also *Braselton Bros. v. Better Maid Dairy Products*, 110 Ga. App. 515, 515-516 (1) (139 SE2d 124) (1964) ("The purpose of the Summary Judgment Act was to provide a procedure which would eliminate the necessity of the trial of contested law suits. In the light of this exclusive purpose, the intention of the General Assembly could have been only that the time for such a procedure would be prior to a trial which was designed to end in a final judgment in the case. . . . The rule contemplates an inquiry in advance of trial as to whether there is a genuine issue and may be invoked for the purpose of striking sham claims and defenses which obstruct a prompt determination of the truth.") (citations and punctuation omitted).

[14] As noted above, in addition to partially granting Bennett's motion in limine, the court also allowed Bennett to have a continuing objection to any evidence or arguments that were only relevant and admissible as to Count 3.

[15] "Evidence that is both irrelevant and prejudicial is inadmissible." (Citation and punctuation omitted.) *Wheeler v. Stewart*, 234 Ga. App. 714, 716 (507 SE2d 540) (1998).

ionship on Moore and his family, the guilt Moore suffered as a result of being the driver at the time of a collision that injured his family members, and the effect of his family members' injuries on Moore's emotional health and ability to work. Even after the trial court ruled in favor of Bennett on Count 3, Moore's counsel presented a closing argument that included numerous, highly prejudicial references to evidence that was, at that point, no longer to be considered by the jury, such as "four badly mangled bodies and one badly mangled mind," Kevin "gurgling in that ditch," and Kevin being "brain damaged for the rest of his life."

Because such evidence and argument were only relevant to Count 3 of Moore's claim, a claim for which he was never entitled to recover, and because of its extremely prejudicial nature, the court erred in failing to exclude it.

(b) Bennett argues that the trial court erred in failing to give the jury two of her requests to charge. "It is well settled that in order for a refusal to charge to be error, the requests must be entirely correct and accurate, and adjusted to the pleadings, law, and evidence, and not otherwise covered in the general charge." (Citation and punctuation omitted.) *RNW Family Partnership v. Dept. of Transp.*, 307 Ga. App. 108, 109 (3) (704 SE2d 211) (2010). However,

> [e]ven though a request to charge may be apt, correct and pertinent, it is not necessarily error to fail to charge it. We must look to the charge as a whole to determine whether the court substantially covered the principles embodied therein or whether it was sufficiently or substantially covered by the general charge.

(Citation and punctuation omitted.) Id. Further, "a party cannot successfully complain about the refusal to give a requested charge unless they satisfy their burden of showing that the refusal was both erroneous and harmful." (Citation and punctuation omitted.) *Buford-Clairmont Co. v. RadioShack Corp.*, 275 Ga. App. 802, 806 (4) (622 SE2d 14) (2005).

During the charge conference, Bennett argued that, because extensive irrelevant and prejudicial evidence had been presented to the jury in support of Count 3 of Moore's complaint, and because that cause of action was no longer before the jury, the court should specifically give the following instructions to the jury:

> I charge you that, in order for Plaintiff to prevail for negligent infliction of emotional distress, he must show that he suffered a physical impact, the physical impact caused him physical injury, and the physical injury caused his

mental suffering and emotional distress.

> I charge you that the Plaintiff in this case . . . cannot recover for emotional distress caused by injuries to his wife or grandchildren who were located in the vehicle at the time of the accident.

The court denied the requests, stating that, based upon his previous rulings, "any evidence with respect to mental depression or anguish or anything as to the occupants has been kept out of this trial[.]" The court told Bennett's attorneys, however, that they could argue to the jury that Moore "can only recover [for negligent infliction of emotional distress] with respect to what he physically suffered and that they should make a distinction between purportedly what his mental anguish is as a result of his physical suffering as opposed to the suffering of occupants of the car."

During its charge, the court instructed the jury on mental pain and suffering as follows:

> Pain and suffering includes mental suffering. But mental suffering is not a legal item of damage unless there's physical suffering also which causes the mental suffering. Anxiety, shock, and worry are examples of what might be included under mental pain and suffering. And loss of capacity to work or labor separately from earnings may be considered as a legitimate item of mental suffering.[16]

As Bennett points out, the court's instruction that "mental suffering is not a legal item of damage unless there's physical suffering also which causes the mental suffering" completely failed to inform the jury that Moore could only recover for his emotional distress that was caused by *his* physical injuries, not the injuries and suffering of his family members. Because Bennett's requested instructions were entirely correct and accurate, were adjusted to the pleadings, law, and evidence, and were not otherwise covered in the general charge, and because the instructions were necessary due to the irrelevant and prejudicial evidence to which the jury was exposed,[17] the court's failure to give them constituted harmful error.

---

[16] Bennett timely objected to the court's failure to give her requested instructions.

[17] We note that, despite the fact that Bennett's counsel told the jury, during closing arguments, that Moore could only recover for his physical injuries and the emotional distress that arose from *his* injuries, such argument does not cure the defect in the charge as given by the trial court. See *Mayor &c. of Washington v. Harris*, 144 Ga. 102, 103 (b) (86 SE 220) (1915) (The Court ruled that, in a suit based on damages to a home as the result of a nuisance, "it is

*RNW Family Partnership v. Dept. of Transp.*, 307 Ga. App. at 109 (3); *Buford-Clairmont Co. v. RadioShack Corp.*, 275 Ga. App. at 806 (4).

Consequently, we reverse the trial court's order to the extent that it enters judgment on the jury's award of $350,000 to Moore, and we remand this case to the trial court for a retrial solely on the issue of damages for Counts 1 and 2 of Moore's complaint, to be conducted in a manner that is consistent with this opinion. We reiterate that, pursuant to Divisions 2 and 3, supra, Moore is precluded from seeking damages for his emotional distress resulting from the injuries to his grandson or for his future medical expenses.

*Judgment affirmed in part and reversed in part, and case remanded with direction for retrial on damages only. Miller, P. J., and Doyle, J., concur.*

DECIDED OCTOBER 27, 2011 —
RECONSIDERATION DENIED NOVEMBER 9, 2011 — 

*Brennan, Harris & Rominger, Mason White, James D. Kreyenbuhl, Drew, Eckl & Farnham, Barbara A. Marschalk, Nicholas P. Smith*, for appellant.

*Savage, Turner, Pinson & Karsman, Brent J. Savage, Lloyd D. Murray*, for appellee.

---

essential that the court in its charge to the jury should give them instructions as to the measure of damages, and a failure to do so is ground for a new trial. The fact that counsel for the plaintiff and for the defendant argued the same rule to the jury as to the measure of damages did not cure the defect in the charge.") (citation omitted).

This is especially true since, after Bennett's counsel finished his closing argument, Moore's counsel told the jury that Moore was entitled to be compensated for "[m]ental pain and suffering [from] the wreck." Given this overly broad and misleading statement by counsel, the court's failure to accurately instruct the jury on this issue, as requested by Bennett, was especially harmful.