A01A1299. CONWAY et al. v. ROMARION et al.
(557 SE2d 54)

POPE, Presiding Judge.

Thomas and Victoria Conway filed suit against Roberto and Linda Romarion asserting that the Romarions concealed extensive pet damage to their home prior to the Conways' purchase of the house. The trial court granted summary judgment to the Romarions, and the Conways appeal. We reverse.

On appeal, we must view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the Conways as nonmovants. *Cotton v. NationsBank,* 249 Ga. App. 606, 607 (548 SE2d 40) (2001). Viewed in that light, the evidence shows that from July 1992 to July 1999, when they sold their house, the Romarions owned as many as five to six cats at one time, three to four of which were male. From July 1992 until approximately March or April 1995, the cats had the complete run of the house, and the Romarions concede that the cats occasionally would defecate or urinate outside their litter box. In addition, the male cats sprayed the walls or furniture approximately two to three times per month. They also admit that the odor of cat urine and spray could be detected upstairs from time to time.

In May 1995, the Romarions decided to confine all but one of the female cats in the basement. That arrangement was continued until May 1999 when the Romarions placed their house on the market and all but one of the cats was kept outside. The Romarions concede, however, that when the cats were kept in the basement, they still would occasionally get upstairs. And the cats continued to occasionally urinate, spray and defecate on the basement carpet, furniture or walls.

In 1995, Roberto Romarion detected a stain on the dropped tile ceiling in the basement. Upon investigation, he discovered that the stain was cat urine and that the cats had defecated and urinated in

the dropped ceiling. As a result, Roberto Romarion replaced 50 four-foot square tiles that had been damaged by cat droppings. He then put up chicken wire to prevent the cats' access to the ceiling. Nevertheless, the cats occasionally still found a way to get into the dropped ceiling, and the Romarions had to take additional measures in an attempt to block their access.

During most of the period that the Romarions owned the house, the basement maintained an odor of cat urine. Roberto Romarion stated that he, in fact, avoided the basement as often as possible due to this odor. The Romarions' real estate agent detected the odor when she visited the house in 1999 prior to listing the house and advised them to take measures to clean up the smell. The Romarions had the carpet cleaned and removed furniture that had been sprayed by the cats.

The Conways first visited the house in July 1999, and at that time, the Romarions owned five cats. Prior to closing, the Conways visited the house approximately four to five times. During those visits they and their real estate agent observed only one cat in the unfinished basement area and two cats outside. Roberto Romarion told Thomas Conway that they only had outside cats. The Romarions' real estate agent also told Victoria Conway that the Romarions' cats were outside cats, although the agent was aware that the cats had previously been kept in the basement.

Neither the Conways nor their real estate agent ever detected any cat-related odor or damage prior to the closing on the house. Roberto Romarion did tell the Conways that he had installed the chicken wire after he discovered the cats had been getting up into the ceiling, but he never told them that the cats had urinated or defecated there. He also pointed out a cat door, which he explained they had closed off because raccoons had been getting into the basement. The Conways and their real estate agent also noticed that the Romarions kept their house cold, so cold that condensation appeared on the house's windows.

A few days after the closing on the property and after the air conditioning in the house had been off for a while, the Conways began to notice the odor of cat urine. Victoria Conway stated that the smell in the basement was so bad it burned her eyes and throat. The Conways removed the carpets throughout the house, but the smell persisted. They then discovered evidence of cat urine and feces in the dropped tile ceiling and baseboards in the basement. When they removed a ceiling tile to investigate, feces fell down on their heads, and they saw that the metal rails supporting the tile were rusted. The Conways also discovered evidence that the cats had gotten into the house's HVAC system and urinated. As a result, the Conways removed the dropped ceiling and portions of the HVAC system and

had to have repairs made to the HVAC.

In addition, the Conways spent in excess of $5,000 to have an industrial odor control company remove the odors in the upstairs portion of the house and the garage. Using blacklight and with the assistance of the odor control company, the Conways began to discover evidence of cat markings throughout the house. They replaced portions of the removed upstairs carpet, but they made no repairs to the basement other than the HVAC.

Approximately one month after the closing, the Conways wrote the Romarions notifying them that they had discovered numerous defects in the house and that they wished to rescind the parties' purchase and sale agreement. The Romarions did not agree to rescind, and the Conways filed suit slightly more than two months later. The complaint asserted a claim of fraud and sought $32,000 in damages. The Romarions moved for summary judgment, and the trial court granted the motion finding that the Conways had waived their claim of rescission and failed as a matter of law to exercise due diligence to discover the alleged defects in the house.

1. The Conways assert error in the trial court's finding that they had waived their right to rescind the parties' agreement and in denying them the right to amend their complaint to assert a specific claim of rescission. We agree.

A purchaser who claims that he was fraudulently induced to enter into a sales contract has an election of remedies. The first option is to rescind the contract after discovering the fraud and sue in tort to recover the purchase price and any additional damages from the fraud. Alternatively, the purchaser may elect to affirm the contract and sue for damages resulting from the fraud. This, too, is a tort action, but it flows from the underlying contract and is subject to any defenses based upon that contract. *Keller v. Henderson*, 248 Ga. App. 526, 528 (2) (545 SE2d 705) (2001).

In order to effect a rescission, the purchaser must act promptly and adhere to the intent to rescind or risk waiver of his claim: "An announcement of the intent to rescind the contract must be made in a timely fashion, as soon as the facts supporting the claim for rescission are discovered. Moreover, the aggrieved party must adhere to the intent to rescind and may waive any claim for rescission by failing to do so." *Buckley v. Turner Heritage Homes*, 248 Ga. App. 793, 795 (2) (547 SE2d 373) (2001). Rescission, as a forfeiture of rights under an otherwise valid contract, is not favored under the law, and courts are quick to find that the right to rescind has been waived. *Holloman v. D. R. Horton, Inc.*, 241 Ga. App. 141, 146 (3) (524 SE2d 790) (1999). Waiver generally is found where the intent to rescind is

not asserted in a timely fashion[1] or where the purchaser has taken some action inconsistent with the intent to rescind, such as making improvements to the property or taking out a mortgage on the property.[2]

Here, the Conways asserted the intent to rescind in a timely fashion, less than one month after closing. And the evidence shows that the repairs the Conways made to the house were only those necessary to make it liveable until the dispute could be resolved. They removed the stained and damaged items — carpet, ceiling tile, baseboards and drywall — and took active steps to remove the odors only from the upstairs portion of the house and the garage. No repairs were made to the basement other than the HVAC, which emitted cat smells into the upstairs. There is no evidence of any cosmetic repairs unrelated to the alleged damage.

Nevertheless, the trial court found that the Conways had waived their right to rescind by suing "on the contract for damages," citing only the *Holloman* case. In that case, however, the Hollomans waited one year after closing before presenting the homebuilder with a list of 169 defects in the house and demanding repairs. Three months later, they sent a letter announcing the intent to rescind the contract. Approximately two months later, the Hollomans filed suit asserting claims for breach of contract and Fair Business Practices Act violations against the homebuilder, in addition to claims of fraud, negligence and Georgia Racketeer Influenced & Corrupt Organizations Act violations against the builder and others. *Holloman*, 241 Ga. App. at 146 (3). Although the complaint contained a prayer for rescission, this Court found that the prayer was not a part of the cause of action. Id. The *Holloman* opinion concluded that the complaint had affirmed the contract and waived any claim for rescission. Id. at 146-147.

We find the Conways' actions and complaint are distinguishable from those of the Hollomans. As previously noted, the Conways promptly indicated their intention to rescind. And although their complaint does not assert a separate claim for rescission, neither does it express a clear election to affirm the purchase and sale agree-

---

[1] See, e.g., *Buckley*, 248 Ga. App. at 795 (purchaser noticed problems within two months, but waited ten months to attempt rescission); *Keller*, 248 Ga. App. at 528 (2) (no effort to rescind); *Holloman*, 241 Ga. App. at 146-147 (3) (no attempt to rescind until fifteen months after closing and after first demanding remedial work on the property).

[2] See, e.g., *Akins v. Couch*, 271 Ga. 276, 278 (2) (518 SE2d 674) (1999) (jury question existed on whether plaintiffs waived rescission where they executed a second security deed after alleged fraud discovered, but retained the right to have it cancelled at any time upon payment of the debt); *Aliabadi v. McCar Dev. Corp.*, 249 Ga. App. 309, 314 (2) (547 SE2d 607) (2001) (purchaser undertook repairs in addition to those necessary to return the house to a liveable condition); *Paden v. Murray*, 240 Ga. App. 487, 489 (1) (523 SE2d 75) (1999) (purchaser undertook substantial remodeling of the house).

ment. There is no claim for breach of contract as there was in the *Holloman* complaint. Rather, the complaint asserts only a claim of fraud, with additional counts for attorney fees and punitive damages. It also asserts that the Conways had rescinded the purchase and sale agreement, noting that the Romarions had rejected their tender. The only exhibit to the complaint is the Conways' letter of rescission.

And while the trial court makes note of the absence of a claim or prayer for rescission, we find that the allegations of fraud in the complaint could also support a claim of rescission. We acknowledge that the complaint does assert that the Conways have been damaged by the cost of repair,[3] but that assertion alone should not defeat their claim of rescission as a matter of law. And while the complaint makes no prayer for rescission, the *Holloman* court itself noted that "the prayer is not an allegation in the complaint which requires an answer (OCGA § 9-11-8 (d)) and is not part of [the] plaintiffs' cause of action." (Citations and punctuation omitted.) 241 Ga. App. at 146 (3).

The better practice, of course, would have been to assert a separate claim for rescission in the complaint, but under these circumstances we cannot say that the Conways have expressed a clear intent to affirm the purchase and sale agreement. Accordingly, we find that the trial court erred in disallowing the Conways' amendment to formally assert a rescission claim. See OCGA § 9-11-15 (c). Nevertheless, to succeed on that claim, the Conways will have to prove that they have taken no action contravening their intent to rescind. See *Akins v. Couch*, 271 Ga. 276, 278 (2) (518 SE2d 674) (1999) (purchaser's intent is an issue of fact for the jury).

2. Additionally, we note that the Conways are not bound by the merger clause in the purchase and sale agreement in asserting their claim for rescission. If the Conways were found to have waived their claim for rescission, however, they would be bound by the contract terms. See *Sudler v. Campbell*, 250 Ga. App. 537, 540 (1) (550 SE2d 711) (2001). But the merger clause does not necessarily bar all claims for fraud. "A merger clause such as the one in the present case prevents a party from claiming reliance upon a representation *not contained in the contract.*" (Footnote omitted; emphasis supplied.) *Fann v. Mills*, 248 Ga. App. 460, 464 (2) (546 SE2d 853) (2001). It does not prevent a claim of fraud arising from representations in the contract itself. Id. Accordingly, to the extent that the Conways assert that the disclosure statement, which was incorporated into the parties' agreement, or some other representation in the contract itself is fraudulent, such a claim would not be barred by the merger clause.

3. The Conways next argue that the trial court erred in finding

---

[3] The Conways filed a first amendment to increase the amount of such damages.

that they failed to exercise due diligence as a matter of law. Once again, we agree.

The issue of whether a purchaser has acted with the requisite due diligence is generally a question for the jury. *Akins*, 271 Ga. at 277. In this case, the trial court found that the Conways had failed to exercise due diligence as a matter of law based upon a number of factors. The trial court first found that the damage to the carpet, walls and baseboard was readily observable. The trial judge also found that the Conways were on notice of the problems with the dropped basement ceiling because they had cats of their own, they observed the cat door and they were told that the cats had gotten into the ceiling previously. The trial court further noted that access to the dropped ceiling was readily accessible. The trial court relied upon *Ben Farmer Realty Co. v. Woodard*, 212 Ga. App. 74 (441 SE2d 421) (1994), to support these conclusions.

But we find that each of the factors noted by the trial court simply raises a jury issue in light of other evidence, distinguishing this case from *Ben Farmer*. In that case, the property at issue was "vacant residential property in obvious dilapidated condition" with many major defects, which the purchaser agreed to buy "as is." 212 Ga. App. at 76. This Court found that these circumstances put the purchaser "on notice to exercise a heightened degree of diligence in inspecting the house." Id. at 77. After closing, the purchaser discovered fire damage in the attic. The evidence showed that the attic was readily accessible through a hole in the ceiling and that merely shining a flashlight through the access hole would have revealed the fire damage. Id. at 76. Under those circumstances, we found that the purchaser had failed to exercise due diligence. Id. at 77.

Here, in contrast, there was nothing to put the Conways on the heightened degree of diligence required of the purchaser in *Ben Farmer*. Neither the Conways nor their real estate agent noticed any pet damage or odor prior to the closing, and the Conways suggest that the damage may have been concealed by the Romarions' furnishings. The evidence also raises an issue as to whether the Romarions took active steps to conceal evidence of pet damage. The Conways testified that after the Romarions moved, they discovered a number of cleaners and chemicals designed to mask pet odors. And during their pre-closing visits, the house was kept so cold that condensation appeared on the windows, which the Conways assert was to aid in masking the odor. In addition, the Conways were told on two separate occasions that the cats were outdoor cats. Victoria Conway stated that while she did observe carpet stains in the circulation patterns, in the absence of an odor, she did not observe anything that led her to believe that more than general maintenance and cleaning would be required.

Further, while the Conways themselves had five cats, they testified that they had never had a problem with the cats not using their litter box. Victoria Conway testified that while Roberto Romarion pointed out the cat door, he told her that it had been closed to keep raccoons out. Similarly, while Roberto Romarion told the Conways that the cats had gotten into the ceiling to sleep, he admits that he never told them that the cats had urinated or defecated there. And while the dropped ceiling was accessible, in the absence of stains or odor on the tile, we believe a question of fact exists as to whether the Conways were required to inspect the area above the dropped ceiling.

Under these circumstances, therefore, we find that the trial court erred in granting the motion for summary judgment on the issue of due diligence.

4. The Conways further claim that the trial court erred in granting the Romarions' motion in limine to exclude an affidavit from the purchaser of the Romarions' prior home. The purchaser averred that she had discovered extensive cat damage and odor in the house only after closing. The affidavit was offered to show the Romarions' intent to defraud and to demonstrate that the Conways did not fail to exercise due diligence.

While we agree that evidence of a prior fraud may be admissible to demonstrate fraudulent intent in the transaction at issue, the party seeking to introduce such evidence must lay a proper foundation, including proof that the prior transaction was fraudulent: "To render such evidence admissible, it must be shown that the other transactions were fraudulent, and it must appear that they were so connected in point of time and otherwise with the one in issue as to make it apparent that all were proposed or carried out in pursuance of a common fraudulent purpose." (Citation and punctuation omitted.) *Ament v. Bennett's Fine Jewelry*, 249 Ga. App. 683, 684-685 (549 SE2d 501) (2001).

The affidavit on its face fails to meet these foundational requirements, as there is no evidence establishing that the Romarions committed fraud in the prior transaction. The affidavit merely states that the prior purchaser did not discover the pet damage until after closing. Accordingly, we cannot say that the trial court abused its discretion in granting the motion in limine.

*Judgment affirmed in part and reversed in part. Barnes and Phipps, JJ., concur.*

DECIDED NOVEMBER 20, 2001 — ▮▮▮▮▮▮▮▮

*Lefco & Blumenthal, Stanley M. Lefco*, for appellants.

*Smith, Gilliam, Williams & Miles, Steven P. Gilliam, Robert A. Weber*, for appellees.