A03A1879. COMMERCIAL & MILITARY SYSTEMS COMPANY, INC. v. SUDIMAT, C.A.

(599 SE2d 7)

JOHNSON, Presiding Judge.

This is an appeal from a judgment entered on a jury verdict. Commercial & Military Systems Company, Inc., a Georgia corporation, refurbishes military trucks and sells them to governments of other countries. In 1995, Sudimat, C.A., a Venezuelan company, agreed to act as Commercial's exclusive representative in Venezuela, and helped Commercial procure a contract to sell 450 refurbished military tactical trucks to the Venezuelan military for $30,000,000. To facilitate delivery of the trucks to the Venezuelan government, Commercial entered into a verbal agreement with Sudimat, whereby Commercial would ship the vehicles to Sudimat in Venezuela, and Sudimat would reassemble, clean and make any necessary repairs to the trucks, then deliver them to the Venezuelan army ("the army

---

contract"). This agreement was not committed to writing until August 1999. In April 1996, however, a Commercial representative did send Sudimat a signed memorandum confirming that Sudimat would receive 20 percent of the sales price of the trucks, less expenses. Sudimat also claimed that it entered into an oral agreement with Commercial regarding the provision of six military trucks to the Venezuelan air force for $640,200 ("the air force contract"). Sudimat would receive a ten percent commission for its involvement in that contract. Commercial denied the existence of any agreement concerning the air force.

In late 1998, after the first shipment of army trucks was delivered to Sudimat and then prepared and delivered to the Venezuelan government, the Venezuelan government paid Commercial the $4.5 million down payment due under the government's contract with Commercial. Commercial then made another shipment of trucks to Sudimat, which prepared the trucks and delivered them to the government. Although it had not yet paid for the first shipment, Commercial paid Sudimat the $224,000 due for the second shipment. Later, Commercial paid Sudimat another $30,000. In all, Commercial sent 150 trucks to Sudimat, who prepared the trucks and delivered them to the government.

On August 6, 1999, the parties executed a "Letter of Agreement," which set out in writing for the first time details of the army contract. The letter stated that Commercial was unable to fulfill the verbal agreement its vice-president, Rick Huntington, made with Sudimat regarding commissions. In the letter, Commercial and Sudimat agreed that "past and future payments for technical assistance and sales commissions to SUDIMAT for Contract No.10-EJ-96, for 450 each M35A2 Military Tactical Trucks will total US$1,250,000.00. . . . That the balance that will be due SUDIMAT is currently US$996,000.00."

The Letter of Agreement acknowledges that Commercial already paid $254,000 for technical assistance and sales commissions, leaving a balance of $996,000. It provides that Sudimat will complete the technical assistance and preparation and address all warranty issues *that may arise* relating to the Venezuelan contract. The agreement also provides for payments to Sudimat of $1,953 per truck delivered by Commercial and accepted by the government 15 days after Commercial receives payment, and payment of $300 for preparation of each truck prior to government inspection, payable after payment is received from the government. The agreement further provides that failure of Sudimat to prepare and repair the trucks to allow for government inspection, resulting in penalties being imposed on Commercial, will result in Sudimat not being paid. It also provides that Commercial will not hold Sudimat responsible for delays caused by Commercial.

After the Letter of Agreement was executed, Commercial made two payments totaling $98,986. Commercial then entered into an agreement with another company, and advised the Venezuelan government that Sudimat was no longer Commercial's representative in that country. Commercial made no more payments to Sudimat.

Claiming Commercial failed to pay it for services provided in connection with the contracts, Sudimat sued Commercial for breach of contract and in quantum meruit. After a trial, a jury awarded Sudimat $1.06 million on the army contract, $64,000 on the air force contract and $67,919 in attorney fees. Commercial appeals from the judgment entered on the verdict. We affirm the judgment of the trial court.

1. In several enumerations of error, Commercial contends that the trial court erred in denying its motion for a directed verdict. We hold that Commercial was not entitled to a directed verdict on any of the grounds asserted.

(a) Commercial argues that it was entitled to a directed verdict on Sudimat's claim for breach of the executory portion of the army contract. Commercial urges that while Sudimat performed some of its duties under the contract and Commercial owes money for those services, it owes no money for those trucks which were not delivered to Sudimat and which Sudimat, therefore, did not work on or deliver to the Venezuelan government. We disagree.

A motion for a directed verdict is proper where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a particular verdict.[1] In determining whether any conflict in the evidence exists, the court must construe the evidence most favorably to the party opposing the motion for directed verdict.[2] The standard used to review the grant or denial of a directed verdict is the "any evidence" test.[3]

Construed most favorably to Sudimat, the evidence did not demand a verdict in Commercial's favor. The Letter of Agreement provided that Commercial would pay Sudimat $1.25 million for sales commissions and technical assistance in connection with the army contract. Sudimat, through its own work, connections and reputation, presented the bid to the Venezuelan government, gathered the required government signatures and procured the contract for Commercial. The parties indicated in the Letter of Agreement that the balance "that will be due SUDIMAT is currently US$996,000."

---

[1] *Hanover Credit Corp. v. Datamatx*, 226 Ga. App. 12, 13 (485 SE2d 571) (1997).
[2] Id.
[3] Id.

According to Commercial, Commercial did not owe the full payment because the army contract was in part an executory contract. An executory contract is one in which something remains to be done by one or more parties.[4]

Here, nothing remained to be done by Sudimat. Sudimat completed its duties as they arose under the contract — after procuring the government contract for Commercial, it readied the trucks it received from Commercial for delivery to the government, and then delivered those trucks to the Venezuelan government.

We are not persuaded by Commercial's argument that under the terms of the agreement, Sudimat was only to be paid for each truck it prepared and delivered to the Venezuelan government. The written agreement, which was drawn up well after the parties began executing the verbal agreement, is not at all clear on this point. Sanin Simone, a Sudimat executive, testified that Commercial agreed to pay the full $1.25 million but that, because Commercial was experiencing financial problems, Commercial executives told him that it needed to spread the payments out over a period of time. Commercial then set out in the Letter of Agreement a timetable for making the payments it owed. This schedule would permit Commercial to pay Sudimat *after* Commercial received payment from the government for the trucks. Commercial admitted in the written agreement that it owed Sudimat a balance of $996,000. Given the record before us, Simone's testimony logically explains the meaning of and intentions underlying those payment provisions.

Nor are we convinced that the provision concerning Sudimat's "failure to perform functions of preparation," demanded judgment in Commercial's favor. That provision is so unclear that it is basically meaningless. The next paragraph of the agreement provides that Sudimat will not be held responsible for delays caused by Commercial. Construing those provisions together, and against Commercial as the agreement's drafter,[5] we interpret the "failure to perform functions" paragraph as penalizing Sudimat if its nonperformance or noncooperation with government inspection procedures and warranty requirements results in the imposition of penalties on Commercial. In other words, it appears to penalize Sudimat in the event Sudimat breaches the agreement and Commercial performs.

And, even assuming arguendo that the army contract was an executory contract, there was evidence supporting Sudimat's breach of contract claim because Sudimat was ready and willing to perform

---

[4] OCGA § 13-1-2 (b).

[5] See *Kuehn v. Selton & Assoc.*, 242 Ga. App. 662, 669 (7) (530 SE2d 787) (2000) (ambiguity in contract is construed against party who drafted it).

its duties.[6] Inasmuch as there was some evidence supporting Sudimat's claim that it performed the duties which arose under the contract, a directed verdict was not required as to this issue.

(b) Commercial argues that the trial court erred in denying its motion for a directed verdict on Sudimat's claim for damages on the army contract because there was no evidence that Sudimat sustained any damages regarding those trucks it did not repair or deliver to the government. We disagree.

Where a party seeks damages for violation of a contract, the measure of damages is what he has suffered by the failure of the other party to perform his part.[7] In other words, it is the amount which will compensate the injured party for the loss which a fulfillment of the contract would have prevented or the breach of it entailed.[8] The injured party, insofar as it is possible to do so with a monetary award, is to be placed in the position he would have been in had the contract been performed.[9]

Commercial admitted in the Letter of Agreement that it currently owed Sudimat $996,000 on the army contract. It is undisputed that Sudimat earned a sales commission for procuring the contract, and it prepared and delivered all trucks which Commercial shipped to Sudimat. Sudimat was entitled to be placed in the position it would have been in had the contract been performed. Commercial was not entitled to a directed verdict on the issue of damages.

(c) Commercial claims the trial court erred in denying its motion for a directed verdict on Sudimat's quantum meruit claim involving the air force contract, if there was a contract, because no evidence was introduced on the value of the benefit to Commercial. There was some evidence of value.

Specifically, a purchase order showed Commercial (in care of Sudimat) as the supplier of six remanufactured tactical vehicles to the Venezuelan air force. The purchase price was $640,200. Commercial's manager admitted that Sudimat was a "key element" in the procurement of the air force contract. There being some evidence of a benefit, Commercial was not entitled to a directed verdict.[10]

(d) In a similar enumeration of error, Commercial maintains that it was entitled to a directed verdict on the breach of contract claim for

---

[6] *James v. Mitchell*, 159 Ga. App. 761, 762 (285 SE2d 222) (1981).

[7] *Oasis Goodtime Emporium I v. Cambridge Capital Group*, 234 Ga. App. 641, 645 (4) (507 SE2d 823) (1998).

[8] Id.

[9] Id.

[10] See generally *Hollifield v. Monte Vista Biblical Gardens*, 251 Ga. App. 124, 130-131 (2) (c) (553 SE2d 662) (2001) (provider entitled to recover in quantum meruit if he shows value of benefit to recipient).

the air force contract because there was no evidence of damages. However, there was testimony establishing that Sudimat began negotiating with the Venezuelan government concerning this contract about a year before it went into effect, and that the parties had agreed that Sudimat would receive a ten percent commission for its services in procuring the air force contract. Commercial was not entitled to a directed verdict in its favor.

(e) Commercial contends the trial court erroneously denied its motion for a directed verdict on Sudimat's claim for attorney fees and expenses of litigation, since there was no evidence that it acted in bad faith, was stubbornly litigious or caused unnecessary trouble or expense. No directed verdict was required on this basis, either.

OCGA § 13-6-11 authorizes an award of litigation expenses where the defendant has acted in bad faith in making the contract, has been stubbornly litigious or has caused the plaintiff unnecessary trouble and expense. Even where there is a bona fide controversy as to liability, a jury may find that a defendant acted in the most atrocious bad faith in its dealing with the plaintiff.[11] Bad faith may be shown by the way in which a party carried out the provisions of the agreement.[12] Questions concerning bad faith, stubborn litigiousness and unnecessary trouble and expense are generally for the jury to decide.[13] An award of fees supported by any evidence must be affirmed.[14]

Trial evidence showed that after the army contract was procured, Commercial unilaterally decided to reduce the amount of commission it would pay Sudimat for its services. Commercial's vice-president at the time, Huntington, told Sudimat in 1998 that its costs were high and that it would reduce the commission from 20 percent to 12 percent. A short time later, Commercial notified Sudimat that it would change the commission to a flat rate per vehicle; Sudimat reluctantly accepted this change. After Commercial made a second shipment of trucks to Sudimat and Sudimat prepared and delivered them to the government, Commercial told Sudimat "we're not going to pay you now. We cannot pay you. We're going to . . . pay you for the next [shipment]." As to Commercial's actions, Sudimat executive Simone testified that Commercial came up "with this new scheme" and was "changing the game all the time."

Simone testified that in July 1999, he found out that Commercial's manager, Chris Broome, and its vice-president, Chin Yu, were

---

[11] *Sass v. First Nat. Bank &c.*, 228 Ga. App. 7 (1) (491 SE2d 76) (1997).
[12] Id. at 8.
[13] *Garrett v. Women's Health Care &c.*, 243 Ga. App. 53, 54-55 (1) (532 SE2d 164) (2000).
[14] *Jim Ellis Atlanta, Inc. v. McAlister*, 198 Ga. App. 94, 98 (3) (400 SE2d 389) (1990).

visiting Venezuela. Simone went to their hotel and told them that he wanted Sudimat's money. The executives told Simone that they wanted to terminate the contract with Sudimat because they suspected wrongdoing on the part of Huntington, a *Commercial* executive, in connection with the contract, and that Commercial was losing money. Simone remarked that Sudimat had to be paid. The Commercial executives replied that Sudimat would be paid, but that Commercial would spread out the amount owed as the rest of the trucks were prepared and delivered. Commercial said it would pay $320,000 immediately, and the rest within 15 days.

When Commercial failed to make the promised payment, Simone called to demand payment. He was told he would need to come to the United States to discuss the matter. Simone said he could not come unless Commercial made a payment of at least $30,000. Commercial made the $30,000 payment and Simone went to the United States. But when he arrived, Commercial informed him it could not pay.

The next day, Broome drafted the August 6 Letter of Agreement. The letter provided that Commercial was unable to fulfill verbal agreements between its agent and Sudimat regarding commissions, that it owed Sudimat $996,000, that it had to date paid $254,000 and that it would make a payment of $320,000 on or about August 9, 1999 (as well as other specific payments when trucks were delivered). After executing the agreement, Commercial made two payments totaling $98,986. Then, on September 17, 1999, Commercial notified the Venezuelan government, but not Sudimat, that it had terminated its relationship with Sudimat.

When Sudimat filed the lawsuit to recover the money due, Commercial filed an answer denying each and every material allegation in the complaint, and urged that the August 6, 1999 agreement upon which the complaint was based was procured by fraud and was unenforceable. At trial, Commercial denied owing any money and argued that no damages were proven. A jury could find from the record that Commercial acted in bad faith, was stubbornly litigious or caused Sudimat unnecessary trouble and expense.[15] There was no error.

2. Commercial argues that the trial court erred in refusing to give to the jury Commercial's requested charge nos. 5 and 9 which, it says, correctly described the measure of damages on a breach of an executory contract claim. The requested charges would have instructed the jury that only profits may be recovered in damages for breach of an executory contract and that costs of performing the contract which were not incurred by the plaintiff may not be included in an award.

---

[15] See *Garrett,* supra.

The trial court charged the jury that "damages are given as compensation for injuries sustained. Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from the breach and as such as the parties contemplated when the contract was made as the probable result of the breach." The court also charged the jury that "loss of profits which would have been earned directly under a contract, except for defendant's alleged breach, are recoverable when they are within the contemplation of the parties at the time of entering into the contract and if they are the legal and natural result of the breach." These charges were appropriate.

The requested charges were not appropriate because Sudimat performed its duties due under the contract as they arose. The Letter of Agreement indicated that Sudimat was currently due $996,000, which was the full amount of the contract minus payments already made, and the evidence showed that Sudimat earned its commission by procuring the contract and completing all work presented to it by Commercial. The court did not err in refusing to give the requested charges on damages.[16]

3. Concerning pre-judgment interest, the court charged the jury that "[t]he amount of damages at the date of the breach of contract may be increased by the addition of legal interest from the time of the breach until the time of recovery." Commercial contends that this instruction was incorrect because the amount of damages was not ascertainable or liquidated. We find no grounds for reversal.

Commercial states in its brief that "[n]o evidence was introduced during the trial which would indicate that *except for the $222,000.00 in liquidated damages sought by Plaintiff* there were any other damages which were ascertainable at the time of the alleged breach."[17] Thus, by Commercial's own admission the damages were, at least to some extent, liquidated. A charge on liquidated damages was therefore authorized.[18]

In addition, we find no harm in the trial court's omission of the word "ascertained." It is clear that the jury based its pre-judgment interest award on the $996,000 amount the parties agreed was due in the Letter of Agreement, and subtracted from it Commercial's subsequent payment of $98,986.

The case of *SKB Indus. v. Insite*[19] does not require a contrary

---

[16] See generally *Dept. of Transp. v. Dalton Paving & Constr.*, 227 Ga. App. 207, 224-225 (10) (b) (489 SE2d 329) (1997).

[17] (Emphasis supplied.)

[18] See generally *Pulte Home Corp. v. Woodland Nursery & Landscapes*, 230 Ga. App. 455, 457 (3) (496 SE2d 546) (1998).

[19] 250 Ga. App. 574, 579 (4) (551 SE2d 380) (2001).

result. There, we held that the trial court did not err in refusing to award pre-judgment interest because the case involved disputes between the parties as to set-offs and back charges due under the contract.[20] Here, the amount upon which interest was calculated was ascertained, so there was no harm in the trial court's failure to include the word "ascertained" in its instruction. This argument is without merit.

*Judgment affirmed. Eldridge and Mikell, JJ., concur.*

DECIDED MARCH 12, 2004 —
RECONSIDERATION DENIED APRIL 14, 2004 — 

Capers, Dunbar, Sanders & Bruckner, Emory F. Sanders, Sr., Ziva P. Bruckner, for appellant.

Burnside, Wall, Daniel, Ellison & Revell, Thomas R. Burnside, Jr., William C. Davison, for appellee.