**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**March 20, 2013**

# In the Court of Appeals of Georgia

A12A1724, A12A1725. GOODY PRODUCTS, INC. v.
    DEVELOPMENT AUTHORITY OF THE CITY OF
    MANCHESTER; and vice versa.

DILLARD, Judge.

This appeal follows a jury trial in which Goody Products ("Goody") was found

liable to the Development Authority of the City of Manchester ("DAM") for breach

of a lease agreement and fraud, resulting in an award of $6,000,000 in damages. In

Case No. A12A1724, Goody contends that (1) the trial court erred in denying its

motion for directed verdict as to the fraud claim; (2) the trial court erroneously

permitted the jury to interpret certain lease provisions; (3) the trial court erroneously

charged the jury as to the measure of damages for breach of the lease and the measure

of damages as to fraud; and (4) the $6,000,000 verdict is unsupported by the

evidence. In Case No. A12A1725, DAM cross appeals and contends that the trial

court erred by (1) using a pre-trial motion in limine to address the sufficiency of its claim as to damages under OCGA § 51-9-1 and (2) ruling that its damages would be addressed by its breach-of-contract claim and, therefore, that it could not proceed with a tortious-interference-with-property claim. For the reasons noted *infra*, we affirm the judgment below in Case No. A12A1724, and need not address the enumerations of error in Case No. A12A1725, which were contingent upon reversal in Case No. A12A1724.

Viewed in the light most favorable to the verdict,[1] the evidence reflects that in the 1960s, Meriwether County leased a manufacturing facility to Goody, a manufacturer of hair-grooming products. Eventually, Goody built an addition to this leased-portion of the building, resulting in a unified eight-acre facility—half of which Goody leased and the other half of which it owned. In 2006, Goody decided to relocate its manufacturing operations and close the Meriwether County facility. And in February 2007, Meriwether County donated and deeded its portion of the facility to DAM. Thereafter, Goody and DAM entered into a sales contract for DAM to purchase Goody's portion of the facility on July 18, 2007.

---

[1] *See Morehouse College, Inc. v. McGaha*, 277 Ga. App. 529, 529 (627 SE2d 39) (2005).

Prior to execution of the sales contract, and unbeknownst to DAM, in April 2007, a team of workers and one Goody representative spent weeks removing copper wiring, buss ducts, and switchgears—all components of the building's electrical system—from the unified building.[2] The removal of these components rendered the building's fire alarm, sprinkler system, air conditioning, office lighting, and wall receptacles inoperable. In short: the eight-acre facility had no power or light, save that provided by a single lightbulb that was left hanging from a pole by an extension cord that ran down to a power substation.

Some eight months earlier, in September 2006, Goody conducted a public auction at the manufacturing facility, during which the components of the electrical system that were subsequently removed from the facility in April 2007 were sold. Goody's director of real estate notified a DAM representative about the auction on August 18, 2006, telling her that Goody intended to auction "used equipment." The DAM representative testified that it never occurred to her that "used equipment" would include "anything that was intrinsic to the functionality of the facility"—*i.e.*, components of the building's electrical system. As a result, DAM saw no need to

---

[2] A buss duct serves as a conduit for power and is more convenient than a wiring conduit. A switchgear provides incoming power to a building by serving as a switchboard.

have someone attend the auction because it was not in the market to purchase the sort of "used equipment" it understood Goody to be selling.

In September 2006 and March 2007, prior to removal of the electrical-system components, Goody granted DAM an option to purchase the Goody-owned portion of the facility for $750,000 and $500,000, respectively.[3] It is undisputed that the facility was operational with all electrical components intact at these times and that the option contracts were for sale of the building "as is." Thus, DAM's representative testified that given the "as is" language of those contracts and the operational status of the facility when she visited in connection with these agreements, she understood that DAM would receive "a functional facility."

Thereafter, in July 2007, after both option contracts had expired, DAM and Goody entered into the final sale agreement by which Goody would sell its portion of the facility to DAM for $500,000. Prior to the execution of this agreement, the DAM representative toured the facility again in May 2007 after Goody had ceased operations and the power was no longer on (the facility was toured by flashlight), but she testified that she was unaware that components of the electrical system had been removed the month before. But when the representative called the power company

---

[3] The price was ultimately reduced to $500,000 due to funding issues.

to change the account into DAM's name in order to turn the power back on, she was informed that the facility was "missing the switchgear." At trial, the representative explained that she initially did not understand the extent of what this "missing switchgear" meant to the functionality of the facility and had no reason to believe that it was a significant issue. Thus, when DAM signed the sales contract in July 2007, it was unaware that the entire electrical system had been removed, and the sales contract provided that the property included "all land and buildings and fixtures," although it permitted Goody to remove machinery and equipment.

But the extent and severity of the electrical-system problems became apparent after Georgia Power called in an electrical contractor for assistance when the lights would not come on. The contractor walked around the building and quickly realized that all of the power-distribution components were missing from the facility, describing its current state as one appearing to have been ravaged by a tornado.[4] As

---

[4] Additionally, a prospective manufacturing tenant toured the facility and learned of the considerable restoration work that would be required for it to become functional once again. This prospective tenant was "livid" at the state of the building, and, as a result, DAM contacted Goody's director of real estate in September 2007 to inquire as to what had happened to the building and whether he was aware that all copper wiring had been stripped from the facility.

a result, DAM immediately spent $383,000 in order to install temporary lighting in the manufacturing portion of the facility.

With lighting temporarily restored, DAM enlisted two individuals who had previously worked for the company and performed the majority of Goody's installation work in the relevant facility. And after one month of inspections and calculations, DAM received an estimate of what it would cost to restore the building to full electrical function by replacing each of the numerous removed components. The total amount, including a standard fifteen-percent markup, was $4,268,743.65 to install buss ducts, switchgears, and copper wiring—*i.e.*, $2.8 million for the DAM-owned portion of the building and $1,468,743.65 for the Goody-owned portion of the building.

Thereafter, the dispute between the parties centered around Goody's removal of the electrical-system components. DAM sued Goody for breach of the lease that controlled the DAM-owned portion of the building and for fraud with regard to the sale of the Goody-owned portion of the building. Ultimately, the jury returned a verdict in favor of DAM, finding that Goody breached the lease, engaged in fraud, and owed DAM $6,000,000 in damages. This consolidated appeal follows.

1. First, Goody contends that the trial court erroneously denied its motion for directed verdict as to DAM's fraud claim because DAM could not assert that the claimed misrepresentations were inconsistent with the terms of the parties' sales contract. We disagree.[5]

Specifically, Goody argues that because DAM retained the benefits of the bargain of the sales contract, which contained a merger clause, it was estopped from asserting that it relied upon representations outside of those contained in the agreement.[6] To that end, Goody contends that because the sales contract provided that "[a]ny fixtures attached to the property are included in the sale," DAM could not successfully assert a claim for fraud because the relevant electrical equipment had been removed prior to execution of the agreement. According to Goody, DAM advanced its fraud claim "based upon representations in the two expired and void option contracts, which had nothing to do with the sale, and what DAM's Executive

---

[5] DAM contends that Goody waived this enumeration of error, but we are satisfied that Goody preserved this enumeration of error for review on appeal.

[6] *See generally Donchi, Inc. v. Robdol, LLC*, 283 Ga. App. 161, 163 (1) (a) (640 SE2d 719) (2007) ("In cases where the allegedly defrauded party affirms a contract which contains a merger clause or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail." (punctuation omitted)).

7

Director thought was included in the sale," which Goody contends ultimately had the effect of varying the unambiguous terms of the sales contract.[7] In response, DAM contends that (1) the merger clause did not bar a claim for fraud because the claim was "based on intrinsic defects in the subject matter of the contract, namely that Goody had removed the electrical system from the facility," and (2) the contract itself contained misrepresentations to the extent that the electrical equipment constituted fixtures.

In reviewing the denial of Goody's motion for directed verdict, we note that a directed verdict is appropriate only if "there is no conflict in the evidence as to any material issue and the evidence introduced, construed most favorably to the party opposing the motion, demands a particular verdict."[8] And here, the trial court properly denied Goody's motion. The expired option contracts were not used to vary the terms of the sales contract but were instead evidence from which the jury could

---

[7] We note that Goody does not appeal the trial court's denial of its motion in limine, which sought to exclude admission of the option contracts.

[8] *Wolff v. Middlebrooks*, 256 Ga. App. 268, 270 (1) (568 SE2d 88) (2002) (punctuation omitted).

8

determine that (1) there was an intrinsic defect at the time of sale[9] and/or (2) the sales contract itself contained a misrepresentation.[10] As DAM repeatedly argued, the option contracts and the circumstances surrounding them were evidence of DAM's due diligence as to its inspections of the building prior to execution of the contract, which represented that fixtures would be included. And indeed, Goody's director of real estate testified that his own expectation before signing the sales contract was that the DAM representative had toured the facility "on many occasions" and that she "understood the condition of the property."[11] Thus, the relevant evidence supported

---

[9] *See Browning v. Stocks*, 265 Ga. App. 803, 803-04 (1) (595 SE2d 642) (2004) (when contract contained merger clause, "[i]n the absence of any claim that the fraud arose from representations which were part of the sales contract, the [appellees'] suit for damages was necessarily based on [the] claim that [the appellant] fraudulently induced them to enter into the sales contract by actively or passively concealing" damage).

[10] *See Conway v. Romarion*, 252 Ga. App. 528, 532 (2) (557 SE2d 54) (2001) ("[A merger clause] does not prevent a claim of fraud arising from representations in the contract itself.").

[11] The director of real estate also testified that when he toured the facility with the DAM representative in March 2006, he did not tell her specifically that Goody was selling electrical equipment but instead that Goody was "selling everything in the facility." He also testified that he informed her inside the switchgear room that "all would be sold" and that he offered to sell DAM Goody's manufacturing equipment, but DAM represented that it was "only interested in the building." The DAM representative denied that Goody's director of real estate ever represented that components of the electrical system would be removed and sold.

9

an inference that Goody passively concealed the removal of the electrical-system components[12] and/or assisted the jury in evaluating DAM's exercise of due diligence (or lack thereof) and the reasonableness of its subsequent understanding that the language of the sale's contract encompassed *all* fixtures, including the components of a fully functional electrical system.[13] Accordingly, the argument that the trial court erred in denying the motion for directed verdict is without merit.

---

[12] *See Browning*, 265 Ga. App. at 804 (1) (defining passive concealment as when "the seller who knows of the defect does nothing to prevent the buyer from discovering it but simply keeps quiet about it"); *see also Batey v. Stone*, 127 Ga. App. 81, 81 (192 SE2d 528) (1972) ("Concealment of material facts may amount to fraud when . . . the concealment is of intrinsic qualities of the article which the other party, by exercise of ordinary prudence and caution, could not discover, and misrepresentation may be perpetuated by acts as well as words, and by artifices designed to mislead." (citation omitted)); *Southern v. Floyd*, 89 Ga. App. 602, 602 (2) (80 SE2d 490) (1954) (same).

[13] *See SCM Corp. v. Thermo Structural Prods., Inc.*, 153 Ga. App. 372, 373 (1) (A) (265 SE2d 598) (1980) (holding that, despite merger clause, evidence that buyer was unable to view manufacturing process in full because parts of the system were shut down on each visit "raised an issue as to whether appellants had prevented appellee from exercising its own judgment and had concealed and misrepresented a material defect relating to the panel processing operation"); *see also Conway*, 252 Ga. App. at 533 (3) ("The issue of whether a purchaser has acted with the requisite due diligence is generally a question for the jury.").

2. Next, Goody contends that the trial court erred in charging the jury that its duties included construing provisions of the lease governing "fixtures." Again, we disagree.

To begin with, we note that DAM contends that this enumeration of error has been waived, interpreting Goody's argument on appeal as relating to the trial court's charge—or instruction—to the jury in this regard. And to the extent Goody makes such an argument, we agree with DAM that Goody has waived appellate consideration of the relevant charge because Goody failed to object to same.[14]

Nevertheless, our inquiry is not at an end. Although Goody's specific argument in this enumeration of error is not entirely clear, it appears that Goody takes issue with the trial court's decision to *submit* the issue to the jury.[15]

---

[14] *See* OCGA § 5-5-24 (a).

[15] We do not find DAM's assertion of waiver disingenuous because it appears from the plain language of Goody's listed enumerations of error that Goody took issue with the instruction to the jury. And although Goody makes reference to arguments that it made at a pre-trial motion-in-limine hearing, as well as a vague reference to the court's denial of a nondescript motion, Goody does not specify *which* motion's denial it deems to be in error (*i.e.*, whether it is the pre-trial motion in limine or the motion for directed verdict). Nevertheless, because Goody contends in its reply brief that the error "was not in the language of the instruction, but in the fact that it was given at all," we will construe this enumeration of error forgivingly, so as to consider the trial court's decision to submit the issue to the jury. *See Lee v. Ga. Power Co.*, 296 Ga. App. 719, 723 (5) (675 SE2d 465) (2009).

11

In considering this argument, we begin by noting that the issue of contract construction is usually a question of law for the court to resolve and, as such, it is subject to *de novo* review.[16] And this review is guided by three fundamental principles of contract construction. First, if the agreement is unambiguous, "the court will look to the contract alone to find the intention of the parties."[17] But if the contract *is* ambiguous, "the existence or nonexistence of an ambiguity is a question of law for the court."[18] And finally, the issue of interpretation becomes a jury question only when there appears to be "an ambiguity in the contract which cannot be negated by the court's application of the statutory rules of construction."[19]

Here, the lease that controlled the portion of the facility owned by DAM—and previously owned by Meriwether County—provided that the property was to be kept in "good order and repair" and that Goody was permitted to make "additions, improvements or alterations" that would "become a part of the Project"; however, the

_____

[16] *Mon Ami Int'l, Inc. v. Gale*, 264 Ga. App. 739, 740-41 (1) (592 SE2d 83) (2003).

[17] *Id.* at 741 (punctuation omitted).

[18] *Id.* (punctuation omitted).

[19] *Id.* (punctuation omitted).

12

lease also provided that "machinery, equipment, furniture or fixtures" that Goody placed on the property could be removed under certain circumstances.

Given the foregoing, DAM contends that because the facility contained a fully functioning electrical system when it was first leased to Goody, any changes Goody made to the electrical system were "improvements" that could not be removed. On the other hand, Goody argues that the relevant electrical components were "fixtures" that it had the right to remove under the plain terms of the contract. Nevertheless, DAM maintains that, reading the lease as a whole, "fixture" was intended to mean "trade fixture" but not "improvements." And as to this issue, in response to Goody's pre-trial motion in limine as to the measure of damages for breach of lease and then again when Goody moved for directed verdict at trial, the trial court determined that the lease agreement was sufficiently ambiguous so as to create an issue for the jury's resolution, specifically as to whether the term "fixtures" referred to "trade fixtures" or also included permanent improvements to the property. In doing so, the trial court did not err.

To begin with, we do not agree with Goody that the language of the lease is plain and unambiguous. Furthermore, applying the rules of OCGA § 13-2-2 to the

13

relevant lease language, we are satisfied that the trial court did not err in submitting the issue to the jury.[20] Section 3.1 (b) of the agreement specifies that

> [t]he Company may, also at its own expense, make any additions, improvements or alterations to the Project that it may deem desirable for its business purposes, provided that such additions, improvements or alterations do not adversely affect the operating unity of the Project or

---

[20] In addition to its argument that the contract was unambiguous, on appeal, Goody also asserts that the trial court never "attempt[ed] to construe the Lease or even suggest it was unable to do so" but instead "summarily gave the issue to the jury." It appears from the record that the parties made extensive arguments as to the ambiguity or, as Goody argued, lack of ambiguity in the lease agreement during the motion-in-limine hearing concerning the measure of damages for breach of the lease. At the end of the relevant arguments, the court indicated that it would take the question of ambiguity under advisement. And later that day, the court e-mailed the parties to inform them that it found the lease provisions "sufficiently ambiguous, for purposes of this motion, so that a jury, under proper instruction, should decide whether 'fixtures' refers only to trade fixtures or includes permanent improvements to the property." Thus, while Goody is correct that the trial court's response to the issue of ambiguity does not reflect conclusions of law as to the application of the rules of construction, there is no indication that the trial court did *not* apply this analysis in the interim between its first consideration of the issue at the motion-in-limine hearing and its decision on the matter later that day. *Cf. Camaron v. State*, 246 Ga. App. 80, 82 (2) (539 SE2d 577) (2000) (holding that absent evidence in record that court failed to consider first offender treatment as required, appellate court would presume trial court acted correctly). Moreover, Goody makes no specific argument to support its contention that application of the rules of construction would resolve any purported ambiguity, as Goody appears to rely almost entirely upon its argument that the lease was not at all ambiguous. *See Vadde v. Bank of Am.*, 301 Ga. App. 475, 478 (1) (a) (687 SE2d 880) (2009) (failure to provide cogent argument or citation of authority in support of alleged error resulted in waiver).

14

its character as a permissible undertaking under the Amendment and are located wholly within the boundary lines of the Leased Realty.

And Section 3.1 (d) provides that

[a]ll such additions, improvements and alterations, whether made by the Company or the County . . . shall become a part of the Project; provided, however, that any machinery, equipment, furniture, or fixtures installed by the Company (not the County) on the Project without expense to the County and not constituting a part of the Leased Equipment may be removed by the Company at any time . . . .

Accordingly, in light of these two provisions, we agree that the contract was ambiguous and that the issue of whether "fixtures" was intended to mean "trade fixtures" or whether it included permanent improvements was properly submitted to the jury for its consideration.

3. Goody next contends in two separate enumerations of error that the trial court erred in charging the jury (1) as to an improper measure of damages based on the jury's resulting interpretation of the lease provision and (2) as to the measure of damages for fraud. Again, we disagree.

15

When we review an allegedly erroneous jury charge, we apply a "plain legal error" standard of review.[21] And we will not overturn a trial court's decision to give a particular jury charge "if there was *any evidence* presented at trial to support giving the charge."[22] In determining whether some evidence exists to support the instruction, we are not authorized "either to weigh existing evidence or to judge witness credibility as these matters are within the province of the jury."[23] Accordingly, a trial court does not err when "it charges the jury on a particular issue even when the evidence justifying the charge is slight."[24]

In the case *sub judice*, DAM asserts that Goody has waived appellate review of its enumerations of error related to jury charges by failing to comply with the requirements of OCGA § 5-5-24 when, after the jury was charged but before it returned its verdict, Goody told the trial court that it maintained its objections as previously stated. This contention is without merit.

---

[21] *See Stephens v. State*, 305 Ga. App. 339, 343 (4) (699 SE2d 558) (2010).

[22] *Bennett v. Moore*, 312 Ga. App. 445, 455 n.8 (1) (718 SE2d 311) (2011) (punctuation omitted).

[23] *Id.* (punctuation omitted).

[24] *Id.* (punctuation omitted).

16

Pursuant to OCGA § 5-5-24 (a), "in all civil cases, no party may complain of the giving or the failure to give an instruction to the jury unless he objects thereto before the jury returns its verdict, stating distinctly the matter to which he objects and the grounds of his objection." In this respect, DAM is correct that objections made at charge conferences do not preserve charging issues for appellate review.[25] But here, we are able to review the transcript of the charge conference. And the combined transcript evidence demonstrates that the trial judge "sufficiently understood the nature of [Goody's] objections to enable him to rule intelligently on the specific point and that [Goody] reiterated [its] objections after the charge was given, albeit without repeating the specific factual or legal basis of the objection."[26]

With these guiding principles in mind, we will now address each of Goody's enumerations of error in turn.

(a) First, Goody argues that as a direct result of the alleged error discussed *supra* in Division 2, the trial court departed "from the Lease's measure of damages

---

[25] *See Tucker Nursing Ctr., Inc. v. Mosby*, 303 Ga. App. 80, 87 (5) (692 SE2d 727) (2010); *Hurst v. J.P. Colley Contractors, Inc.*, 167 Ga. App. 56, 57 (2) (306 SE2d 54) (1983).

[26] *McDowell v. Hartzog*, Case No. S12G0369, 2013 WL 56989, at *2 (Ga. Jan. 7, 2013).

17

('good order and repair') to the wholly different measure of 'restoration' damages." Goody also argues that the trial court erred in instructing the jury that it was authorized to award legal interest from the point of breach until recovery because "there is no evidence in the record of damages at the time of the breach." Thus, Goody ultimately contends that the "charge to the jury on damages on the breach of contract claim was contrary to applicable law[,] resulting in a windfall to DAM."

The trial court instructed the jury as follows:

> [DAM] alleges that [Goody] breached the terms of the lease agreement. The lease is a contract. If you find that [DAM] is entitled to recover under the terms of the lease, the damages recoverable are such as arise naturally and according to the usual course of things from the breach and such as the parties contemplated when the contract was made as the probable result of the breach.

> The measure of damages for injury to the lease premises is the amount necessary to restore it to its condition before the injury.

> The amount of damages as to the date of breach of the contract may be increased by the addition of legal interest from that time until the time of recovery.

> Damages are given as pay or compensation for injury.

18

When one party is required to pay damages to another, the law seeks to ensure that the damages awarded are fair to both parties.

If you believe from a preponderance of the evidence that [DAM] is entitled to recover, you should award [DAM] such sums as you believe are reasonable and just in the case.

We discern no error in the trial court's instruction to the jury as to damages for breach of the lease agreement. Indeed, because we held in Division 2, *supra*, that the trial court did not err in allowing the jury to construe the ambiguous lease provisions, as a result of the jury's determination, it was not limited to the lease's "good order and repair" measure of damages.[27] Instead, the trial court properly instructed the jury as to the measure of damages for breach of contract. And the measure of damages for breach of contract is "the amount which will compensate the injured party for the loss which a fulfillment of the contract would have prevented or the breach of it entailed."[28] The injured party, as much as it is possible to do so with a monetary

---

[27] Because this instruction was proper, it is of no consequence that DAM did not present evidence of the facility's condition at the time of signing the lease compared to its condition at termination of the lease because the measure of damages was not limited to "good order and repair."

[28] *Oasis Goodtime Emporium I, Inc. v. Cambridge Capital Group, Inc.*, 234 Ga. App. 641, 645 (4) (507 SE2d 823) (1998).

19

award, is to "be placed in the position he would have been in had the contract been performed."[29] As for breach-of-contract actions involving injury to real property, the general rule is that the measure of damages "is the diminution of the fair market value of the property and/or the cost of repair or restoration, but limited by the fair market value at the time of the breach or tort."[30] Finally, in breach-of-contract actions in all cases where an amount ascertained would be the damages at the time of the breach, "it may be increased by the addition of legal interest from that time until the recovery."[31]

Thus, the trial court properly instructed the jury as to the measure of damages for breach of the lease agreement which, as found by the jury, was committed by Goody's removal of numerous electrical-system components from the leased premises.[32] Moreover, DAM presented evidence that the cost of repairing or restoring

---

[29] *Id.*

[30] *Robert E. Canty Bldg. Contractors, Inc. v. Garrett Machine & Constr., Inc.*, 270 Ga. App. 871, 873 (1) (608 SE2d 280) (2004) (punctuation omitted).

[31] OCGA § 13-6-13; *see also* OCGA § 7-4-2 (a) (1) (A) ("The legal rate of interest shall be 7 percent per annum simple interest where the rate percent is not established by written contract.").

[32] The jury, finding that Goody breached the lease agreement, obviously agreed with DAM's interpretation of the contract and determined that the electrical-system

20

the leased premises to its pre-injury condition amounted to $2.8 million for replacement of the components that were removed by Goody. Additionally, there was testimony that the damage caused to the building *after* the breach was not included in this total. And to the extent Goody contends that the measure of damages was unreasonable, it had "the burden to present any contradictory evidence challenging the reasonableness or proportionality" and, when appropriate, "evidence of an alternative measure of damages for the jury's consideration."[33] Accordingly, the trial court did not err in its charge to the jury.

(b) Next, Goody argues that the trial court erred in charging the jury as to the measure of damages for fraud because there is "no evidence in this case at all that shows the difference between the value of the building Goody sold to DAM at the time of closing in August 2007 . . . and what its value would have been if the building contained the Electrical Equipment removed months prior to the Sales Contract."

As to the measure of damages for fraud, the trial court instructed the jury, in pertinent part, as follows:

---

components became part of the project and were not subject to removal.

[33] *John Thurmond & Assocs., Inc. v. Kennedy*, 284 Ga. 469, 471 (1) (668 SE2d 666) (2008).

21

In this case, [DAM] contends that [Goody] has committed the tort of fraud. The measure of damages in an action for fraud and deceit is the actual loss sustained. If the contract is one [for] purchase and sale, the actual damages are the difference between the value of the thing sold at the time of delivery and what its value would have been if the representations made had been true. The defrauded party may show this difference in value by evidence of the reasonable cost of restoration.

Damages for fraud in a case such as this is [sic] the benefit of the bargain standard, that is, to award to the plaintiff that which it expected to receive had there been no fraud.

The trial court's instructions to the jury were proper. In an action for fraud, the measure of damages is "the actual loss sustained, and if the contract is one of purchase and sale the actual damages are the difference between the value of the thing sold at the time of delivery and what its value would have been if the representations made had been true."[34] An alternative method of showing the difference in value is "to prove the reasonable cost of correcting the defect."[35] Overall, the measure of damages is "the same measure applied [when] a builder has failed to complete the

[34] *Miner v. Harrison*, 205 Ga. App. 523, 526 (3) (422 SE2d 899) (1992); *accord Barnette v. Peace*, 196 Ga. App. 440, 440-41 (395 SE2d 916) (1990).

[35] *Barnette*, 196 Ga. App. at 441; *see also Miner*, 205 Ga. App. at 526 (3).

building of a house according to [a] contract."[36] And, as a general rule, damages for defective construction are determined by "measuring the cost of repairing or restoring the damage, unless the cost of repair is disproportionate to the property's probable loss of value."[37]

Accordingly, the trial court's instructions were appropriate because the evidence supported the alternative method of calculation—*i.e.*, the difference in value was shown by the reasonable cost of correcting the problem. Indeed, the instructions were supported by DAM's evidence that it would cost $1,468,743.65 to restore the building's electrical-system components that were removed from the premises, and there was also evidence that it cost $383,000 to restore temporary lighting to the manufacturing half of the building, which was primarily located in the Goody-owned portion. Thus, the trial court's charge was supported by the evidence and not erroneous.

---

[36] *Windsor Forest, Inc. v. Rocker*, 115 Ga. App. 317, 322 (2) (154 SE2d 627) (1967); *accord Orkin Exterminating v. Bryan*, 163 Ga. App. 804, 805 (294 SE2d 683) (1982) (physical precedent only).

[37] *Pollman v. Swan*, 289 Ga. 767, 769 (2) (716 SE2d 191) (2011) (punctuation omitted)); *accord John Thurmond & Assocs., Inc.*, 284 Ga. at 470 (1).

4. Finally, Goody contends that even if the trial court correctly instructed the jury as to the measure of damages for breach of the lease agreement and fraud, "there is no discernible path in the evidence to that amount [*ie*, $6,000,000]." First, Goody contends that DAM should not have been permitted to include the $383,000 it cost to restore lighting to the facility temporarily to its amount of damages and second, that an award of legal interest was impermissible due to a lack of evidence of damages to the leased-portion of the facility at the time of breach. We disagree.[38]

To begin with, the jury was authorized to conclude that the installation of temporary lighting was necessary for the restoration process, given that the combined eight-acre facility was, prior to such installation, lit by a single lightbulb hanging from a pole.[39] Second, because DAM presented evidence as to the restoration costs of the leased-portion of the building as a result of Goody's breach of contract ($2.8 million),[40] the jury was authorized to award legal interest from the point of breach

---

[38] DAM again asserts that Goody has waived this enumeration of error, but we are not convinced that the authorities cited by DAM support this contention and, thus, we decline to find waiver as to this enumeration of error.

[39] *See John Thurmond & Assocs., Inc.*, 284 Ga. at 469 (1) ("Juries . . . are given wide latitude in determining the amount of damages to be awarded based on the unique facts of each case.").

[40] *See supra* Division 3 (a).

until the time of recovery over four years later.[41] Accordingly, there was support for the jury's award of $6,000,000 in damages based on DAM's evidence that it cost $383,000 to restore temporary lighting and $4,268,743.65 to restore the missing electrical components ($1,468,743.65 for the Goody-owned portion and $2.8 million for the leased portion), and the fact that an award of legal interest was permissible as to the breach-of-lease claim.

Moreover, although Goody argues that general damages cannot make up any portion of the verdict because the trial judge instructed DAM's counsel during closing that DAM's damages were limited to the cost of restoration, Goody ignores the fact that the trial court ultimately decided to instruct the jury as to general damages on DAM's claim for fraud.[42] And Goody entered no objection to this charge

---

[41] *See* OCGA § 13-6-13; *see also Commercial & Military Sys. Co. v. Sudimat, C.A.*, 267 Ga. App. 32, 39 (3) (599 SE2d 7) (2004). We also note that despite Goody's argument that no interest could be awarded on the fraud claim, the record reflects that the trial court only instructed the jury as to its ability to award legal interest on the breach-of-lease claim.

[42] Specifically, prior to instructing the jury as to the measure of damages discussed in Division 3 (b), *supra*, the trial court instructed the jury as follows:

> Now, as to fraud. A tort, such as fraud, is the unlawful violation of a private legal right.

at either the charge conference or after the instruction was given, nor does Goody appeal this instruction.[43] General damages are those which the law "presumes to flow from any tortious act," and "they may be recovered without proof of any amount."[44] Additionally, general damages may be awarded on a fraud claim.[45] And here, there was evidence that would support an award of general damages on the fraud claim,

---

General damages are those which the law presumes to flow from any tortious act and they may be recovered without proof of any specific amount to compensate the plaintiff for the injury done to it.

[43] *See* OCGA § 5-5-24 (a) (providing that "in all civil cases, no party may complain of the giving or the failure to give an instruction to the jury unless he objects thereto before the jury returns its verdict, stating distinctly the matter to which he objects and the grounds of his objection").

[44] OCGA § 51-12-2 (a); *see First. S. Bank v. C & F Servs., Inc.*, 290 Ga. App. 305, 307 (2) (659 SE2d 707) (2008); *see also M&M Mortgage Co. v. Grantville Mill, LLC*, 302 Ga. App. 46, 49 (2) (690 SE2d 630) (2010); *In re Estate of Ziegler*, 295 Ga. App. 156, 159 (2) (b) (671 SE2d 218) (2008); *Cavin v. Brown*, 246 Ga. App. 40, 43 (2) (a) (538 SE2d 802) (2000).

[45] *See First S. Bank*, 290 Ga. App. at 307 (2) (holding that general damages "may be awarded on a fraud claim" (punctuation omitted)); *see also M&M Mortgage Co.*, 302 Ga. App. at 49 (2) ("[E]vidence may be submitted from which the trier of fact may fairly estimate the amount of general damages that will reasonably compensate for the wrong done. A broad range of general damages may flow from fraud." (citation and punctuation omitted)); *Cavin*, 246 Ga. App. at 43 (2) (a) ("General damages awarded on a fraud claim may cover a broader range of damages than those awarded on contract claims.").

including that the manufacturing facility had remained empty due to its condition and that DAM had lost opportunities to rent the facility.[46]

As we have repeatedly emphasized, this Court will not interfere with the trial court's approval of a verdict unless "it is so flagrantly excessive, in light of the evidence, as to show bias, prejudice, or gross mistake by the jury."[47] There being no such indication here, we will not reverse the entry of judgment upon the jury's award.

For all of the foregoing reasons, the trial court's judgment is affirmed.

*Judgment affirmed. Ellington, C. J., and Phipps, P. J., concur.*

---

[46] *See M&M Mortgage Co.*, 302 Ga. App. at 49 (2) (finding support for award of general damages as to fraud when there was evidence of resulting difficulties in conducting business). *Cf. Johnson v. GAPVT Motors, Inc.*, 292 Ga. App. 79, 83 (1) (663 SE2d 779) (2008) (holding that material issues of fact remained as to whether general damages resulted from alleged fraud, including inconvenience to the plaintiff-appellant).

[47] *McGaha*, 277 Ga. App. at 534 (2); *see also* OCGA § 51-12-12 (a) ("The question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case."); *Green v. Proffitt*, 248 Ga. App. 477, 478 (1) (545 SE2d 623) (2001) ("The issue of damages is a matter for the jury, and a reviewing court should not interfere with the jury's damages award unless it is so small or excessive that it justifies an inference of gross mistake or undue bias. Because the jury's award is not so excessive as to justify an inference of gross mistake or bias, we will not interfere with it." (footnote omitted)).